1

2

3

4

5

6

7              UNITED STATES DISTRICT COURT

8            CENTRAL DISTRICT OF CALIFORNIA

9

10  REVOLUTION EYEWEAR,      )   Case No. CV 02-01087-VAP
    INC., a California      )   (CWx)
11  corporation,            )
                            )   **MEMORANDUM OPINION ON**
12              Plaintiff,  )   **EQUITABLE ISSUES TRIED TO**
                            )   **COURT AFTER TRIAL BY JURY;**
13       v.                 )   **FINDINGS OF FACT AND**
                            )   **CONCLUSIONS OF LAW ON**
14  ASPEX EYEWEAR, INC., a   )   **INTERVENING RIGHTS DEFENSES**
    Delaware corporation,   )
15  and THIERRY IFERGAN,    )
                            )
16              Defendants. )
    AND RELATED             )
17  COUNTERCLAIMS           )
    _____ )

18

19      This case was tried to a jury on September 18, 19, 20

20  and 21, 2007, on Counterclaimant Contour Optik, Inc.'s

21  ("Contour") claim for damages for patent infringement

22  under 35 U.S.C. §§ 271, 284 against Counterclaim

23  Defendant Revolution Eyewear, Inc. ("Revolution").  The

24  jury returned a verdict awarding damages of $4,319,530.70

25  to Contour on September 21, 2007.[1]

26  _____

27      [1]Although Aspex Eyewear Inc., Manhattan Design Studio
    Inc., and Asahi Optical Co. Ltd. remain counterclaimants
28  in this case, only Contour sought damages.  (See Brosas
    Decl. Ex. 9, Tr. of Trial, Sept. 20, 2007 at 7-13.)
                                        (continued...)

1     Revolution seeks to limit the damages award through

2 application of the doctrines of absolute intervening

3 rights and equitable intervening rights under 35 U.S.C. §

4 252.[2]  In addition to its verdict of monetary damages for

5 patent infringement, the jury returned answers to twelve

6 special interrogatories submitted to it on issues

7 relating to the intervening rights defenses.  After

8 discharging the jury, the Court inquired of the parties

9

10     [1](...continued)
11 Accordingly, the jury awarded damages to Contour only.

12     [2]The relevant portion of that section states:

13     A reissued patent shall not abridge or affect
14 the right of any person or that person's
   successors in business who, prior to the grant
15 of a reissue, made, purchased, offered to sell,
   or used within the United States, or imported
16 into the United States, anything patented by the
   reissued patent, to continue the use of, to
17 offer to sell, or to sell to others to be used,
   offered for sale, or sold, the specific thing so
18 made, purchased, offered for sale, used, or
   imported unless the making, using, offering for
19 sale, or selling of such thing infringes a valid
   claim of the reissued patent which was in the
20 original patent. The court before which such
   matter is in question may provide for the
21 continued manufacture, use, offer for sale, or
   sale of the thing made, purchased, offered for
22 sale, used, or imported as specified, or for the
   manufacture, use, offer for sale, or sale in the
23 United States of which substantial preparation
   was made before the grant of the reissue, and
24 the court may also provide for the continued
   practice of any process patented by the reissue
25 that is practiced, or for the practice of which
   substantial preparation was made, before the
26 grant of the reissue, to the extent and under
   such terms as the court deems equitable for the
27 protection of investments made or business
   commenced before the grant of the reissue.

28 35 U.S.C. § 252.

2

1  whether either side requested to introduce additional
2  evidence on the intervening rights defenses; neither side
3  sought that opportunity, and the Court then set a
4  deadline for the parties to file their written briefs on
5  the issue.

6

7      On October 5, 2007, Contour filed its "Memorandum of
8  Points and Authorities Regarding Revolution's Affirmative
9  Defense and Counterclaim for Intervening Rights"
10 ("Contour's Br."), accompanied by exhibits authenticated
11 by the Declaration of Josephine Brosas, and Revolution
12 filed its "Post-Trial Brief on Intervening Rights"
13 ("Revolution's Br."), accompanied by a Declaration of
14 counsel R. Joseph Trojan and a Declaration of Gary Zelman
15 (under seal).

16

17     Following the submission of the post-trial briefs,
18 Contour submitted written evidentiary objections to the
19 Trojan and Zelman Declarations, to which Revolution
20 responded and Contour in turn replied.

21

22             **CONTOUR'S EVIDENTIARY OBJECTIONS**
23 **Evidence of the Jury's Deliberations and Verdict**
24     On October 5, 2007, counsel for Revolution, R. Joseph
25 Trojan, submitted a Declaration setting out the substance
26 of post-trial discussions he had with the foreperson of
27 // // //

28

1  the jury.[3]  In particular, the Trojan Declaration

2  purports to recount the basis for the jury's verdict and

3  its findings on the special interrogatories submitted to

4  it.

5

6      Contour argues that the hearsay evidence regarding

7  the jury's deliberations and verdict is wholly

8  inadmissible, was obtained in an unethical manner, and

9  should be stricken.  It further asks the Court for

10 various other remedies, including the opportunity to

11 depose opposing counsel, an order striking portions of

12 the post-trial brief submitted by Revolution, and an

13 order striking post-trial evidence submitted by that

14 party.

15

16     In Tanner v. United States, the Supreme Court

17 reviewed the "near-universal and firmly established

18 common-law rule in the United States [that] flatly

19

20 _____

21     [3]In part, Revolution attempts to justify the
   submission of this inadmissible evidence by adducing
22 additional declarations by Gary Zelman, Revolution's
   principal, and others, to the effect that Michael
23 Nicodema, counsel for Contour, was present for all or
   part of the post-trial discussions with the jurors, and
24 failed to object to them.  (See, e.g., Suppl. Decl. of
   Gary Zelman, filed October 26, 2007.)  Contour's counsel
25 disputes this, (see, e.g., Decl. of José Peña, filed
   October 17, 2007), but in any event, Mr. Nicodema's
26 presence during any discussion between Mr. Trojan and
   trial jurors would have no effect whatsoever on the
27 inadmissibility of the evidence under F. R. Evid. 606(b).
   For this reason, among others, the Court is wholly
28 unpersuaded by Revolution's irrelevant submissions on
   this subject.

4

prohibited the admission of juror testimony to impeach a jury verdict," noting that exceptions to this rule were rare and were generally limited to instances where the jury allegedly had been affected by "extraneous influences." <u>Tanner v. United States</u>, 483 U.S. 107, 117 (1987) (citations omitted).  Holding evidence of juror inebriation during the trial inadmissible to impeach a jury's verdict in a criminal case, the Court relied in part on the longstanding "substantial policy considerations support[ing] the common-law rule against the admission of jury testimony to impeach a verdict," quoting the following excerpt from its 1915 decision in <u>McDonald v. Pless</u>:

> [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be

1     a private deliberation, the constant subject of

2     public investigation - to the destruction of all

3     frankness and freedom of discussion and

4     conference.

5  Tanner, 483 U.S. at 119 (quoting McDonald v. Pless, 238

6  U.S. 264, 267-68 (1915)).

7

8     There are examples too numerous to list of courts

9  within this Circuit applying this prohibition to bar

10 consideration of the type of evidence offered here.  See

11 Hard v. Burlington Northern R. Co., 870 F.2d 1454, 1461

12 (9th Cir. 1989) (affirming trial court's refusal to

13 consider juror declarations regarding discussion during

14 jury deliberations in FELA case, even though evidence

15 related to truthfulness of jurors' answers during voir

16 dire); Morgan v. Woessner, 997 F.2d 1244, 1260 (9th Cir.

17 1993) (trial court affirmed after finding Rule 606(b) did

18 not permit consideration of evidence regarding jurors'

19 motives for plaintiffs' civil rights verdict); United

20 States v. Stacey, 475 F.2d 1119, 1121 (9th Cir. 1973)

21 (holding inadmissible post-verdict evidence that jurors

22 were confused about elements of criminal offense:  "After

23 a verdict is returned a juror will not be heard to

24 impeach the verdict when his testimony concerns his

25 misunderstanding of the court's instructions."); United

26 States v. Span, 75 F.3d 1383, 1390 n.8 (1996) (evidence

27 that jurors "misunderstood the applicable law and would

28

1  have acquitted" defendant in criminal case if they had
2  been properly instructed is inadmissible under F.R. Evid.
3  606(b)'s bar on the use of a juror's "mental processes"
4  to inquire into the validity of a verdict).
5
6      Here, at least two prohibitions exist barring
7  consideration of the evidence from Revolution's counsel.
8  First, the evidence is rank hearsay.  Not a single
9  declaration from a trial juror has been submitted, and
10  counsel's statement as to the alleged out-of-court
11  statements is hearsay.  Moreover, even if a declaration
12  of a trial juror, signed under penalty of perjury, had
13  been filed, Federal Rule of Evidence 606(b) unambiguously
14  renders such evidence inadmissible; according to Mr.
15  Trojan, the statement would have consisted of a
16  description of the mental processes of the jurors in
17  reaching the jury's verdict, or the alleged
18  misunderstanding of the court's instructions.  This is
19  precisely the type of evidence that Rule 606(b), and the
20  Supreme Court authorities cited above, proscribe.
21
22      Accordingly, the Court sustains Contour's objections
23  to the Trojan Declaration, and to the corresponding
24  sections of Revolution's Post-Trial Brief on Intervening
25  Rights, and has disregarded any arguments contained in
26  the Post-Trial Brief to the extent they rely on the
27  // // //
28

1  objectionable evidence, i.e., matters allegedly disclosed
2  by any trial juror in this case.

3

4  **Declaration of Gary Zelman**

5      Revolution submitted a Declaration of Gary Zelman,
6  its owner and President, along with its post-trial brief.
7  Zelman opines on his company's ability to satisfy the
8  damages verdict, and the Declaration attaches four
9  exhibits:

10          (1)  Revolution's June 30, 2007 Balance Sheet;
11          (2)  Revolution's Profit & Loss Statement for January
12                through June, 2007;
13          (3)  Revolution's 2006 Balance Sheet;
14          (4)  Revolution's Profit & Loss Statement for 2006.
15  The Declaration also contains a Price Breakdown between
16  various lines of IMF eyewear, and attaches a copy of a
17  declaration previously submitted in opposition to an
18  application for Temporary Restraining Order.

19

20      Contour objects to the Declaration and its
21  attachments on multiple grounds.  The Court sustains the
22  objections for the following reasons.

23

24      Revolution never disclosed in discovery, nor in
25  pretrial disclosures, including even the joint Exhibit
26  List, the information regarding the price breakdown of
27  Revolution's eyewear lines and the financial documents
28

which it now attempts to introduce, post-trial, by attaching them to this Declaration.  The evidence is inadmissible for this reason alone.

The evidence, including Mr. Zelman's opinion on Revolution's ability to pay a judgment which includes the money damages awarded by the jury in this case and the financial documents attached as exhibits, is irrelevant to the issues of absolute or equitable intervening rights.  Consideration of the factors set forth in <u>Visto Corp. v. Sproqit Technologies, Inc.</u>, 413 F. Supp. 2d 1073, 1090 (N.D. Cal. 2006), <u>see</u> <u>below</u>, and the additional relevant bars to relief, e.g., unclean hands or wilful infringement, <u>id.</u>, would not render this evidence material.

Finally, the parties did not seek, and were not granted, leave to submit additional evidence with their post-trial briefs, particularly evidence not relevant to the issues of intervening rights, and which would not be subject to cross-examination.

Accordingly, the Court sustains the objections to the Zelman Declaration.

// // //

// // //

// // //

## EFFECT OF THE JURY'S FINDINGS

Contour asserts that the Court should treat the jury's findings in its answers to the special interrogatories submitted to in the Special Verdict as "advisory," and as to certain of those findings, should disregard them.   [Contour's Br. at 17-18.]

The Constitutional right to a jury trial extends only to "legal" as opposed to "equitable" claims.  <u>Beacon Theatres Inc. v. Westover</u>, 359 U.S. 500, 510-11 (1959). When equitable claims are joined with legal claims and have factual questions in common, the legal claims must be tried first before a jury; otherwise, the right to a trial by jury could be impaired by collateral estoppel resulting from the court's determination of facts on the equitable claims.  <u>Calnetics Corp. v. Volkswagen of America, Inc.</u>, 532 F.2d 674, 690 (9th Cir. 1976).

Issues of fact going solely to an equitable issue should be decided by the Court, after consideration of any advisory findings of the jury.  <u>See</u>, <u>e.g.</u>, <u>In re Metoprolol Succinate Patent Litigation</u>, 494 F.3d 1011, 1020 (Fed. Cir. 2007).  Federal Rule of Civil Procedure 39(c) provides for the use of advisory juries, as follows:

> ADVISORY JURY AND TRIAL BY CONSENT.
> In all actions not triable of right by a jury the court upon motion or of its own initiative may try any issue with an advisory jury . . . .

In general, while a court may seek the jury's aid as a fact-finding body in a non-jury trial, it may not abrogate its responsibility as "chancellor in equity" to apply the facts to the law so that equitable results may prevail.  89 C.J.S. Trial § 1077 (citing <u>Sanders v. Stone</u>, 255 Ga. 704 (1986)).  Indeed, the Eighth Circuit has found it reversible error when a trial court submitted an equitable issue to the jury for a conclusive, rather than advisory, determination.  <u>Bevan v. Honeywell, Inc.</u>, 118 F.3d 603, 613 (8th Cir. 1997). In <u>Bevan</u>, the district court submitted the calculation of a front pay award to the jury over the defendant's objection; the Eighth Circuit reversed, explaining, "While the district court may, in its equitable discretion, submit the issue to a jury in an advisory capacity, the district court in this case improperly submitted the issue to the jury for a conclusive determination."  <u>Id</u>.

Here, the jury made two findings relevant to Revolution's equitable intervening rights defense: that Revolution made 'substantial preparations' for manufacture or sale of the infringing eyewear before the reissue, and that Revolution had "existing orders or contracts relating to the infringing eyewear before the [reissue date]."  (Special Verdict at 2-3.) Like the front pay calculation in <u>Bevan</u>, these findings are relevant solely to an equitable issue as to which the

Court must make an independent determination.  Moreover, these findings do not affect any legal, as opposed to equitable, issues, and thus the Court may treat them as advisory without disturbifrng the jury's determination of facts on the legal issues.  Cf. Mercantile & General Reinsurance, 82 N.Y.2d 248, 253 (1993) (holding that the judge could treat a jury's findings on equitable issues as advisory where such treatment would not "contradict any of the factual findings the jury made in deciding the factual issues pertinent to the legal claim.")

   Accordingly, the Court treats the jury's findings embodied in its answers to the special interrogatories submitted in the Special Verdict as advisory.

## ABSOLUTE INTERVENING RIGHTS

   Under 35 U.S.C. § 252 "an accused infringer [has] the absolute right to use or sell a product that was made, used, or purchased before the grant of the reissue patent as long as this activity does not infringe a claim of the reissue patent that was in the original patent."  BIC Leisure Prod. v. Windsurfing Int'l, 1 F.3d 1214, 1220-21 (Fed. Cir. 1993).

   Here, Contour agrees that Revolution had 55,984 IMF and IMFT frame sets in its inventory as of February 12, 2002, the date the '545 patent issued.  (Contour's Br. at

23-24; Revolution's Br. at 5.)   The parties dispute the value of those frame sets, however.

At trial, Revolution's principal testified that the price for each IMF frame set is "45 or 46 dollars," and for each IMFT set is "between 66 and 67" dollars.  (<u>See</u> Contour's Br. at 24.)   Contour argues that because Revolution offered no evidence to establish the relative numbers of (cheaper) IMF versus (dearer) IMFT frames in its inventory on the relevant date, the Court should use the lower figure of $45.00, and then apply the jury's reasonable royalty rate of 5%, for a total of $125,964. (<u>Id</u>.)   Revolution contends it is entitled to $136,812.50, based on a calculation that assumes 7,666 of the frame sets in inventory were higher-cost IMFT frame sets, but fails to point to any evidence in the trial record to support that number.  (<u>See</u> Revolution's Br. at 6, Ex. 3.)

Where "actual damages can not be ascertained with precision because the evidence available from the infringer is inadequate," doubt is resolved against the infringer.  <u>Sensonics, Inc. v. Aerosonic Corp.</u>, 81 F.3d 1566, 1572 (Fed. Cir. 1996).   Revolution failed to establish at trial with reasonable certainty the number of frame sets in its inventory worth more than $45.00. Accordingly, the Court finds Revolution is entitled to a reduction of the damages awarded against it under its

defense of absolute intervening rights, in the amount of $125,964.[4]

## EQUITABLE INTERVENING RIGHTS

"Under the equitable intervening rights [doctrine] of [35 U.S.C. § 252], a district court has discretion to grant broader rights for an accused infringer to: (1) continue the manufacture, use, offer for sale, and sale of additional articles made before the reissue; and (2) continue to manufacture, use, offer to sell, or sell articles for which substantial preparations for manufacture or use was made before the grant of the reissue." Shockley, 248 F.3d at 1361.

Courts consider the following factors in determining whether to grant equitable intervening rights:

> (1) whether "substantial preparation" was made by the infringer before the reissue; (2) whether the infringer continued manufacturing before reissue on advice of its patent counsel; (3) whether there were existing orders or contracts; (4) whether non-infringing goods can be manufactured from the inventory used to manufacture the infringing product and the cost of conversion; (5) whether there is a long period of sales and operations before the patent reissued from which no damages can be assessed; and (6) whether the infringer has made profits sufficient to recoup its investment.

[4]The issues of the number and price of infringing frame sets Revolution had on hand at the date the reissue patent issued could have been tried to the jury. See, e.g., Shockley v. Arcan, Inc., 248 F.3d 1349, 1353, 1357 (Fed. Cir. 2001). The parties here, however, agreed to have these facts decided by the Court.

<u>Visto Corp. v. Sproqit Technologies, Inc.</u>, 413 F. Supp. 2d 1073, 1090  (N.D. Cal. 2006).

Furthermore, in <u>Shockley</u>, the Federal Circuit denied equitable intervening rights because the defendant had unclean hands, i.e., it was a willful infringer. <u>Shockley</u>, 248 F.3d at 1361.  To establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent.  <u>In re Seagate Technology, LLC</u>, 497 F.3d 1360, 1371 (Fed. Cir. 2007).

**Unclean Hands and Willful Infringement**

Contour has met its burden here:  it has shown, by clear and convincing evidence, that Revolution has unclean hands.  Revolution willfully infringed[5] Contour's patent when it continued to sell the infringing frames after the Court granted Contour's motion for summary

---

[5] Revolution's claim that Judge Morrow's Order of July 20, 2007 excluded any evidence relating to willful infringement lacks merit. (<u>See</u> Revolution's Br. at 10-13.)  The July 20 Order only excluded evidence offered in support of Revolution's affirmative claim for willful infringement.  It explicitly allowed evidence of willful infringement to be admitted "for other relevant purposes." (Order of July 20, 2007 at 8.)  Evidence of willful infringement is relevant to counter the defense of equitable intervening rights, and thus is admissible for that purpose.

judgment on the issue of infringement on April 30, 2007.[6]
Moreover, Revolution expressed its intent to continue
selling the infringing products, despite its knowledge of
their infringing nature, until its remaining inventory
was gone.  (<u>See</u> Brosas Decl. Ex. 6, Tr. of Trial, Sept.
19, 2007, Morning Session at 94.)  Finally, not only did
Revolution continue to sell its infringing products, but
it began to sell them at a steep discount, further
injuring the profit potential of the rightful patent
holder.  (<u>See</u> <u>id.</u> at 88-100.)

**Substantial Preparations**

The jury found that Revolution proved "by a
preponderance of the evidence that it made 'substantial
preparations' for manufacture or sale of the infringing
eyewear before the February 12, 2002 issue date [of the
'545 patent]."  (Special Verdict at 2.)  The Court treats
this finding as advisory, and must make its own finding.
<u>See</u> <u>supra</u>.

Revolution bears the burden of proof on this issue
regarding its affirmative defense.  At trial, however, it
provided scant evidence regarding the amount of its
investment in the infringing frames.  At most, its
evidence on this issue consisted of testimony by Mr.
Zelman that the company grew in revenue and in number of

---

[6] The Court need not decide whether Revolution
willfully infringed before April 30, 2007.

employees, and that it moved to a larger headquarters. (Brosas Decl. Ex. 7, Tr. of Trial, Sept. 19, 2007, Afternoon Session at 81-91.)  Revolution adduced no evidence, however, to prove how much, if any, of the company's growth was due to investment in the infringing product as opposed to non-investment related growth, or investment in non-infringing products.  The only evidence that Revolution invested funds in the infringing products in the expectation that they were non-infringing was Mr. Zelman's bald statement that he expanded his business "[t]remendously" after Revolution was found not to infringe the '207 patent.  (Id. at 81.)  The Court finds Mr. Zelman's vague testimony on this issue insufficient to carry Revolution's burden; apart from the opaque and conclusory nature of the evidence, it is entirely unclear how much of that "tremendous" investment occurred before June 12, 2002, the date of the '545 patent's issuance.

Finally, even if the Court were to accept the jury's finding that Revolution made a "substantial" investment in the infringing frames, the record at trial lacks any evidence to support a finding by the Court of any specific dollar amount of investment.  For all these reasons, the Court finds that Revolution has failed to establish its equitable defense on the basis of substantial investment.

**Advice of Counsel**

If, before the reissue patent was issued, the infringer received advice of counsel indicating that its accused product would not infringe the original patent, the Court may weigh such a factor in favor of granting equitable intervening rights. <u>Seattle Box</u>, 756 F.2d at 1580.  In that case, the Federal Circuit stressed the equitable nature of this factor, explaining that in the original patent, the patentee had "dedicated to the public" the design used by the patentee, since it was within the scope of the original patent specification but not within the scope of the original claims. <u>Id</u>.  It therefore would be a "gross injustice" to allow the patentee to obtain damages from one who had used a design the patentee had dedicated to the public, even if that design fell within the scope of the reissue patent.  <u>Id</u>.

Here, there is evidence that, before the '545 reissue patent issued, Revolution obtained advice of counsel indicating that it did not infringe the original patent. (Brosas Decl. Ex. 7, Tr. of Trial, Sept. 19, 2007, Afternoon Session at 74, 79; Joint Exhibit List Ex. 55, 56.)[7]  Moreover, the same equitable considerations exist

---

[7]Revolution argues that Special Verdict Question Number 6, which asked the jury if Revolution relied on the advice of counsel after August 7, 2003, is not relevant to this equitable consideration. (Revolution's Br. at 8-9.)  Revolution waived any objection to this Special Verdict Question at trial when Revolution's

(continued...)

here that existed in <u>Seattle Box</u>:   Revolution used a
design that was within the scope of the initial
specification but not claimed in the initial patent, so
it might be unjust to allow Contour to obtain damages
from a design it had previously "dedicated to the
public."  This equitable consideration, however, may be
outweighed by Revolution's "unclean hands."

### Existing Orders or Contracts

The jury found that Revolution had "existing orders
or contracts relating to the infringing eyewear before
the February 12, 2002 issue date." (Special Verdict at
2-3.)  The Court treats this finding as advisory, and
must make its own finding.  <u>See</u> <u>supra</u> § 5.

Contour argues that Revolution presented no
"detailed, corroborated evidence" of existing contracts
at trial, and that "Mr. Zelman gave no testimony at trial
on the issue of existing contracts." (Contour's Br. at
18.)[8]

---

[7](...continued)
counsel stated he had no objection to any question in the
verdict form.  (Brosas Decl. Ex. 9, Tr. of Trial, Sept.
20, 2007 at 28.)  Nevertheless, because the question does
not address whether Revolution relied on advice of
counsel *before* the reissue patent issued, the Court does
not consider the jury's finding on Question 6.
    [8]The testimony of Mr. Zelman regarding licensing
agreements pertains to agreements entered after the
reissue patent was issued.  (Brosas Decl. Ex. 6, Tr. of
Trial, Sept. 19, 2007, Morning Session at 62-61.)

1    At trial, Mrs. Zelman testified that she supervised
2 the performance and fulfillment of all such contracts
3 with third parties.  (Brosas Decl. Ex. 9, Tr. of Trial,
4 Sept. 20, 2007 at 81-91.)  When asked if Revolution had
5 entered into celebrity contracts prior to February 12,
6 2002, Mrs. Zelman testified "I don't think so.  I don't
7 know."  (Id. at 40.)  She did not testify as to whether
8 or not other types of contracts were in existence before
9 2002 until cross-examination, when she was asked:

10         THE CONTRACTS YOU MENTIONED, THE SALES
          REP CONTRACTS, BUYER CONTRACTS, CELEBRITY
11         CONTRACTS, ET CETERA, DO YOU HAVE THE
          DATES OF THOSE CONTRACTS?
12
(Id. at 41.) Mrs. Zelman answered,
13
          NO, I DON'T HAVE DATES.
14
(Id.)
15

16
     On redirect, she was asked:
17
          WHEN YOU SAY YOU DON'T HAVE THE DATES,
18        DOES THAT MEAN THAT WHEN YOU SAID THAT
          YOU KNEW SOME OF THESE CONTRACTS WERE IN
19        EXISTENCE BEFORE 2002, THAT YOU'RE NOW
          SAYING YOU DON'T KNOW  THAT?
20
(Id. at 41-42.) She answered:
21
          NO.  I DON'T KNOW -- HIS QUESTION SOUNDED
22        LIKE IF I KNEW THE ACTUAL DATES WE TOOK
          OUT THESE CONTRACTS.  I DON'T KNOW THE
23        ACTUAL DATES WE ENTERED INTO THEM.  I CAN
          TELL YOU THAT WE'VE HAD CONTRACTS DONE
24        SINCE WE'VE BEEN HERE.  I MEAN, WE'VE
          ENTERED INTO CONTRACTS ALL OF THE TIME.
25            * * *
          IF  YOU'RE  SPECIFYING  A  PARTICULAR
26        CONTRACT THAT WE'VE ENTERED INTO, WITHOUT
          PULLING THE CONTRACT TO KNOW WHEN WE WENT
27        INTO IT, I CAN'T DECIPHER DATES.  I KNOW
          THAT WE'VE HAD CONTRACTS SINCE WE'VE BEEN
28        HERE IN THE BUILDING THAT --

                              20

1
2
3
4
5
6
7
     EVER SINCE THE COMPANY HAS PICKED UP
IN VOLUME, YOU KNOW, WE'VE ENTER INTO
CONTRACTS FOR DIFFERENT LENGTHS OF TIME.
DEPENDING ON SHIPPING, WE ENTER INTO ONE-
YEAR, TWO-YEAR CONTRACTS.  SALES REPS,
THEY HAVE CONTRACTS; THAT'S ALWAYS BEEN
IN EXISTENCE SINCE WE STARTED THE
COMPANY.  WE'VE ALWAYS HAD CONTRACTS WITH
REPS.  SHIPPING, PRETTY MUCH SINCE WE'VE
STARTED, WE'VE ALWAYS HAD CONTRACTS WITH
SHIPPING.
    SO UNLESS I'M TOLD WHICH CONTRACT, I
WOULDN'T KNOWEXACTLY THE DATE OF IT.

8

(<u>Id</u>. at 42.)

9

10   Contour argues that this testimony is "vague and

11   unspecific," lacks supporting documentation, and hence is

12   unreliable.  (Contour's Br. 18.)  The Court agrees.

13   Revolution's witnesses identified not a single specific

14   contract in their testimony, nor did it introduce into

15   evidence any written contract with a third party.  When

16   there is doubt as to the existence of contracts, as there

17   is here, the question should be resolved in equity

18   against the party that controls documentation that could

19   prove or disprove the question.  <u>Cf</u>. <u>Sensonics</u>, 81 F.3d

20   at 1572 (resolving questions of prices charged by an

21   infringer against the infringer).  Here, if Revolution

22   entered into contracts prior to 2002 that carried over

23   into the post-reissue period, it could have produced them

24   at trial, at the very least.

25

26   Accordingly, in determining whether to grant

27   equitable intervening rights, the Court finds this factor

28

weighs against Revolution, because the scant evidence it adduced of existing contracts was unconvincing.

**Other Factors**

The Court may consider other factors in assessing equitable intervening rights, including "whether non-infringing goods can be manufactured from the inventory used to manufacture the infringing product and the cost of conversion." <u>Visto Corp</u>., 413 F. Supp. 2d at 1090. Revolution does not manufacture its own products but has them manufactured by outside vendors. (Contour's Br. 19 (citing Brosas Decl. Ex. 7, Tr. of Trial, Sept. 19, 2007, Afternoon Session at 7).)  Contour argues that the Court should weigh this factor against granting equitable intervening rights, contending Revolution has shown it can make a transition to selling non-infringing frames. (<u>Id.</u> at 20.)  Revolution has no investment in manufacturing, however, so the Court does not consider whether Revolution can recoup any manufacturing investment as a factor for or against granting equitable intervening rights in this case.

A "long period of sales and operations before the patent reissued from which no damages can be assessed" weighs against granting equitable intervening rights because such a period may allow the infringer to recoup its investment. <u>Visto Corp.</u>, 413 F. Supp. 2d at 1090. Here, Revolution had the benefit of four years of sales

for which no damages can be assessed.  (<u>See</u> Contour's Br. 20.)  Accordingly, to the extent that Revolution had any pre-reissue investment in the infringing products, this factor weighs against granting it the right to infringe the reissue patent in order to recoup that investment.

The final factor is "whether the infringer has made profits sufficient to recoup its investment."  <u>Visto Corp.</u>, 413 F. Supp. 2d at 1090.  Here, however, Revolution provided no evidence at trial from which the Court can determine with any precision how much it invested in the infringing frames prior to the reissue or how much profit it made from the sale of those frames. (<u>See</u> Contour's Br. 21; <u>see also</u> supra (discussing the substantial preparations factor))  Accordingly, this factor weighs against granting equitable intervening rights.

**CONCLUSION**

A court will grant equitable intervening rights only when necessary to allow a party to recoup an investment made in good faith reliance on the scope of an original patent.  See <u>Loral Corp. v. The B.F. Goodrich Co.</u>, 14 USPQ2d 1081, 1116 (S.D. Ohio 1989); <u>Gerhardt v. Kinnaird</u>, 162 F. Supp. 858, 864 (E.D. Ky. 1958).  Here, Revolution has shown that it acted in good faith reliance on the scope of the original patent, because it obtained advice of counsel indicating that it did not infringe the

original patent.  Revolution has failed, however, to show that equitable intervening rights are necessary to recoup its investment.  It has produced no showing of a specific amount of pre-reissue investment in the infringing products, so the Court has no way of knowing what would be required to recoup its investment.  Additionally, it has provided no evidence of its profits from which the Court could determine how much additional recoupment is necessary.

Moreover, "[one] who seeks equity must do equity." Mfr.'s Fin. Co. v. McKey, 294 U.S. 442, 449 (1935). Here, compelling evidence exists that Revolution seeks equitable relief despite its own unclean hands:  it willfully infringed Contour's patents, and it sold the infringing products at a steep discount even after it was found to have infringed.  Indeed, like the defendant in Seattle Box, Revolution's "attitude was one of complete contempt for both the original patent and the reissue." Seattle Box, 756 F.2d at 1582-1583 (Nichols, J., concurring and dissenting).  Accordingly, the Court finds that Revolution has not established its affirmative defense of equitable intervening rights.

The Court GRANTS Revolution absolute intervening rights as to 55,984 IMF and IMFT frame sets, and accordingly reduces the damages awarded by the jury's verdict by $125,964.

**FINDINGS OF FACT APPLICABLE TO INTERVENING RIGHTS
DEFENSES**

**Absolute Intervening Rights**

1. The United States Patent & Trademark Office
   issued U.S. Patent No. RE 37,545 ("the '545
   patent") on February 12, 2002, to co-owners
   Aspex and Contour Optik, Inc.

2. On the date the '545 reissue patent issued,
   Revolution had 55,984 frame sets in its
   inventory.  That inventory consisted of unknown
   respective amounts of IMF and IMFT frame sets.

3. Revolution sold its IMF frame sets for $45.00
   apiece.

**Equitable Intervening Rights**

5. On April 30, 2007, summary judgment was issued
   in this action in Contour's favor against
   Revolution, finding Revolution's IMF and IMFT
   frame sets infringed Claim 22 of the '545
   reissue patent.

6. Revolution continued to sell the infringing
   frames after the Court issued its April 30, 2007
   Order.  Its owner expressly stated Revolution's
   intent to continue selling the infringing
   products, even after learning of the Court's
   April 30, 2007 Order.

7. In addition, after the Court entered summary
   judgment of infringement against Revolution,

Revolution began to sell its infringing products at a steep discount, and widely advertised its efforts to do so.  These actions further injured the profit potential of the rightful patent holder, Contour.

8.  Starting before February 12, 2002, but continuing after that date, Revolution moved into larger headquarters, expanded its workforce, and saw its revenues increase.  It is unknown, however, whether these indicia of growth reflect Revolution's investment in the infringing products, or if so, to what extent, and the value of such investment.

9.  Before February 12, 2002, Revolution obtained the advice of counsel that its products did not infringe the original '207 patent.  It is unknown whether, as of the date of the issuance of the '545 reissue patent, Revolution had existing contracts for the purchase or sale of the infringing eyewear, or any other contracts relating to the infringing products.

10. Revolution does not manufacture any products; all the products it sells are manufactured by outside vendors.

11. Revolution sold the infringing eyewear products for four years, i.e., between 1998 and 2002, before the reissue patent was issued, for which no damages can be assessed.

26

12.  It is unknown whether Revolution made profits sufficient to recoup any investment in selling the infringing products, as it did not prove its profits from the sales nor the investment it made in the infringing products.

**CONCLUSIONS OF LAW AS TO INTERVENING RIGHTS DEFENSES**

1.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1338.

2.  35 U.S.C. § 252 provides in relevant part:  "A reissued patent shall not abridge or affect the right of any person or that person's successors in business who, prior to the grant of a reissue, made, purchased, offered to sell, or used within the United States, or imported into the United States, anything patented by the reissued patent, to continue the use of, to offer to sell, or to sell to others to be used, offered for sale, or sold, the specific thing so made, purchased, offered for sale, used, or imported unless the making, using, offering for sale, or selling of such thing infringes a valid claim of the reissued patent which was in the original patent. The court before which such matter is in question may provide for the continued manufacture, use, offer for sale, or sale of the thing made, purchased, offered for sale, used, or imported as specified, or for the

manufacture, use, offer for sale, or sale in the United States of which substantial preparation was made before the grant of the reissue, and the court may also provide for the continued practice of any process patented by the reissue that is practiced, or for the practice of which substantial preparation was made, before the grant of the reissue, to the extent and under such terms as the court deems equitable for the protection of investments made or business commenced before the grant of the reissue."

3. Under the first sentence of this section, codifying the doctrine of absolute intervening rights, "an accused infringer [has] the absolute right to use or sell a product that was made, used, or purchased before the grant of the reissue patent as long as this activity does not infringe a claim of the reissue patent that was in the original patent." BIC Leisure Prod. v. Windsurfing Int'l, 1 F.3d 1214, 1220-21 (Fed. Cir. 1993).

4. Revolution proved by a preponderance of the evidence that it is entitled to a $125,964.00 reduction of the damages awarded against it by the jury in this case, under the doctrine of absolute intervening rights. This amount consists of the reasonable royalty rate (5%) on the sales price actually established ($45.00) on

the amount of Revolution's inventory on the date the '545 reissue patent issued. Where "actual damages can not be ascertained with precision because the evidence available from the infringer is inadequate," doubt is resolved against the infringer. <u>Sensonics, Inc. v. Aerosonic Corp.</u>, 81 F.3d 1566, 1572 (Fed. Cir. 1996). Here, there was evidence that Revolution's inventory on that date included both IMF and IMFT frames, and that the latter eyewear sold for a higher price, but Revolution failed to prove the relative amounts of the two different types of products in its inventory. Accordingly, the Court resolves the issue against it, and fixes the value of the inventory at the lower price established.

5.   Section 352 of Title 35 also codifies the doctrine of equitable intervening rights. "Under the equitable intervening rights [doctrine] of [35 U.S.C. § 252], a district court has discretion to grant broader rights for an accused infringer to: (1) continue the manufacture, use, offer for sale, and sale of additional articles made before the reissue; and (2) continue to manufacture, use, offer to sell, or sell articles for which substantial preparations for manufacture or use was made

29

before the grant of the reissue." <u>Shockley</u>, 248 F.3d at 1361.

6. The following factors may be considered by the Court in deciding whether to grant equitable intervening rights:

(a) whether "substantial preparation" was made by the infringer before the reissue;

(b) whether the infringer continued manufacturing before reissue on advice of its patent counsel;

(c) whether there were existing orders or contracts;

(d) whether non-infringing goods can be manufactured from the inventory used to manufacture the infringing product and the cost of conversion; (e) whether there is a long period of sales and operations before the patent reissued from which no damages can be assessed;

(f) whether the infringer has made profits sufficient to recoup its investment; and

(g) whether the defendant acted with unclean hands, i.e., it was a willful infringer.

<u>Visto Corp. v. Sproqit Technologies, Inc.</u>, 413 F. Supp. 2d 1073, 1090 (N.D. Cal. 2006); <u>Shockley</u>, 248 F.3d at 1361.

7. To establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high

likelihood that its actions constituted
infringement of a valid patent.  In re Seagate
Technology, LLC, 497 F.3d 1360, 1371 (Fed. Cir.
2007).

8.   There is clear and convincing evidence here that
Revolution acted with "unclean hands" after it
learned of the Court's April 30, 2007, Order
Granting Summary Judgment in favor of Contour
and finding that Revolution's products infringed
Claim 22 of the '545 patent. It continued to
sell its infringing eyewear products despite its
knowledge of their infringing nature; its owner,
Gary Zelman, stated that the company intended to
continue to sell the infringing products after
the April 30, 2007, Order; and Revolution
embarked on efforts to sell the infringing
products at deeply discounted prices.

9.   Revolution failed to prove that it had existing
contracts regarding the infringing eyewear
products at the time the '545 patent issued,
that it made "substantial preparation" or
investment before the '545 patent issued, and
whether or not it made profits sufficient to

1   recoup any investment made.  Thus, it has not
2   established that is entitled to the defense of
3   equitable intervening rights.

4

5

6   Dated: <u>January 3, 2008</u>

7                    <u>VIRGINIA A. PHILLIPS</u>
                     United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28